UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                                        Criminal No. 10-88 (DWF/FLN)

        Plaintiff,

    v.                                                                    **REPORT AND**
                                                                                **RECOMMENDATION**
**02- Adrian Salinas Ortega,**
**03- Julio Armando Holguin Martos,**

        Defendants.
_____

Jeffrey M. Bryan & Allen A. Slaughter, Assistant United States Attorneys, for Plaintiff.
Daniel B. Mohs for Defendant Ortega.
Douglas Olson for Defendant Martos.
_____


    **THIS MATTER** came before the undersigned United States Magistrate Judge on May 5, 2010 on Defendant Ortega's Motion for Suppression of Statements, Answers or Admissions in the Nature of Confessions [#42] and Motion for Suppression of Physical Evidence Obtained from a Search and Seizure [#43] as well as Defendant Martos' Motion to Suppress Evidence Obtained as a Result of Search and Seizure [#34] and Motion to Suppress Statements, Admissions and Answers [#35].

At the hearing, the Court received testimony from James Carroll and Jose Frank Gomez. The Government submitted seven exhibits into evidence.[1] Defendant Ortega, Defendant Martos ("Defendants") and the Government submitted post-hearing briefs. (Doc. Nos. 58, 60 and 61.)

The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, the Court recommends Defendants' suppression motions be **DENIED**.

## I.    FINDINGS OF FACT

**A.    Search Warrants**

Minneapolis Police Officer James Carroll requested the warrants in this case and served as the affiant for each application. (*See* Gov't Exs. 1-4.)

### 1.    Search Warrant for U-Haul

The search warrant application for the U-Haul at issue, drafted by affiant Carroll, recites the following events in support of the issuance of a search warrant for the vehicle. (Gov't Ex. 1.)

"Within the past two weeks" before the issuance of the warrant on March 30, 2010, Officer Carroll received information from a confidential reliable informant ("CRI") about a drug distribution network "selling cocaine and marijuana in the Minneapolis area." (Gov't Ex. 1 at 1-2.) The CRI "stated that this drug distribution network is headed by an Hispanic male named 'Arluro.'" *Id.* The CRI later positively identified a photograph of Arluro Lopez as "Arluro." *Id.*

---

[1] Government Exhibit 1 is an Application for Search Warrant and Supporting Affidavit, Search Warrant, and Receipt, Inventory and Return for a 1997 Ford F-350 U-Haul Cargo Van with AZ plates; Government Exhibit 2 is an Application for Search Warrant and Supporting Affidavit, Search Warrant, and Receipt, Inventory and Return for a specific apartment number at an address on "18th Street E" in Minneapolis, MN; Government Exhibit 3 is an Application for Search Warrant and Supporting Affidavit, Search Warrant, and Receipt, Inventory and Return for a specific address on "Cedar Ave S" in Minneapolis, MN; Government Exhibit 4 is an Application for Search Warrant and Supporting Affidavit, Search Warrant, and Receipt, Inventory and Return for a specific address on "5th Ave S" in Minneapolis, MN; Government Exhibit 5 is a photocopy of Spanish language "Miranda Warning" and "Waiver" card; Government Exhibit 6 is an audio disc labeled "Martos.Miranda.wav;" and Government Exhibit 7 is a photocopy of pages 1 through 5 of "MPD CAPRS Case Report With Supplements-MP-10-086809."

The CRI provided Officer Carroll with multiple addresses for Arluro and his associates and identified an apartment on "18th Ave" in Minneapolis "as a stash location for cocaine and marijuana." *Id.*

Officer Carroll states that, on the warrant's date of issuance, he "was contacted by the CRI who stated that 'Arluro' and his associates were afraid of the stash being robbed so arrangement [sic] were made to rent a U-Haul and move the money and narcotics to a new location." *Id.* Assisting officers confirmed that a U-Haul was parked in front of the stash house location on "18th Ave." Officers observed male associates of "Arluro" as they loaded "large plastic bags" into the back of the U-Haul. *Id.*

The CRI had also provided information that Arluro and his associates utilize "a gold Chevy Trailblazer" to traffic narcotics. *Id.* Surveillance officers observed a gold Chevy Trailblazer follow the U-Haul as it pulled away. *Id.* Officers further observed the Trailblazer "pull off the roadway and then pull back on the roadway in an attempt to detect surveillance." *Id.*

Officer Carroll states that "assisting marked units" initiated a stop of the U-Haul and the Chevy Trailblazer. *Id.* Both vehicles were transported to the Third Precinct, where a certified narcotics canine "indicated a positive hit in the front and rear cargo area of the U-Haul." *Id.*

Based upon the foregoing, Hennepin County Judge Warren R. Sagstuen signed the search warrant application and search warrant for the U-Haul on March 30, 2010. (Gov't Ex. 1 at 1-3, 2-1.) The search warrant receipt, inventory and return indicates that a "set of keys that fit the locks" of a specific apartment unit at an address on "18th St E" was recovered from the vehicle pursuant to a search conducted at 6:30 P.M. on March 30, 2010. (Gov't Ex. 1.)

2.    **Search Warrant for Apartment on 18th Street East**

Although a search warrant was issued for an apartment at an address on 18th Street East on March 30, 2010, no items were recovered pursuant to the search. (Gov't Ex. 2.) Because the search did not result in the seizure of any evidence, the Court will not discuss the search warrant application for the residence with respect to Defendants' suppression motions.

### 3. Search Warrant for Address on Cedar Avenue South

In support of the issuance of a search warrant for the residence at an address located on "Cedar Ave S" in Minneapolis, MN, the search warrant application, drafted by affiant Carroll, contains a verbatim recitation of the facts included in the affidavit accompanying the U-Haul search warrant. (Gov't Exs. 1, 3.) The affidavit for the apartment on Cedar Avenue also includes the following additional information. (Gov't Ex. 3.)

During biographical questioning, Defendant Martos indicated that he resides at a specific apartment number at an address on "18th Street E," the unit for which a warrant had previously issued. (*See* Gov't Ex. 3 at 1-4.) Defendant Martos was one of the individuals observed "loading up the U-Haul and was stopped by marked units." *Id.* "During the stop, officers recovered several sets of keys," some of which appeared to be residential keys while others appeared to correspond to "master locks" and safes. *Id.* Also, during this investigation, Officer Carroll was contacted by the CRI, who relayed that he had been instructed by "Arluro" to go to the address on Cedar Avenue South "to check for his associates and the U-Haul which was destined for that location." *Id.* Officer Carroll and Sergeant Jose Gomez then went to the Cedar Avenue address and "tried the keys recovered from 'Arluro's' associates." *Id.* "Sgt. Gomez tried several keys before he was able to unlock the north exterior door with one of the keys recovered." *Id.* The officers, however, "did not make entry," but contacted assisting officers to set up stationary

surveillance on the residence. *Id.* The CRI again called Officer Carroll "and stated that 'Arluro' is very nervous as he us [sic] unable to contact his associates or locate his U-Haul." *Id.*

While Officer Carroll and Sergeant Gomez "were leaving the rear" of the Cedar Avenue address, a female neighbor stated that "she had observed people in and out of the house frequently over the past two days as it appeared that people were just moving in." *Id.* She further stated "that these Hispanic males were traveling around in a silver Chevy Tahoe." *Id.* Officer Carroll notes that the CRI had previously provided information that "'Arluro' and his associates drive a silver colored Chevy Tahoe." *Id.*

The affidavit also states that the CRI "has furnished reliable and accurate information in the past" and that the CRI's information has "led to the conviction of numerous others for narcotics related crimes." *Id.*

Based upon the foregoing, on March 30, 2010, Hennepin County Judge Warren R. Sagstuen signed the search warrant application and search warrant for a nighttime search of the residence on "Cedar Ave S." *Id.* The search warrant receipt, inventory and return indicates that, among other items, multiple bricks of suspected marijuana and cocaine were recovered from the residence pursuant to a search conducted at 9:00 P.M. on March 30, 2010. (Gov't Ex. 3.)

### 4. Search Warrant for Address on 5th Avenue South

In support of the issuance of a search warrant for the residence at an address located on "5th Ave S" in Minneapolis, MN, the search warrant application, drafted by affiant Carroll, contains a verbatim recitation of the facts included in the affidavit accompanying the Cedar Avenue search warrant. (Gov't Exs. 3, 4.) The affidavit for the residence on 5th Avenue also includes the following additional information. (Gov't Ex. 4.)

5

Officer Carroll executed a search warrant at the address on Cedar Avenue "in the evening hours" of March 30, 2010 "and recovered over 1,500 grams of cocaine which field tested positive and over 100 pounds of suspected marijuana." (Gov't Ex. 4 at 1-4.) Officers also recovered mailings and identification cards, which "link 'Arluro' and his associates presently in custody to the recovered narcotics." *Id.* The CRI had "originally" informed Officer Carroll that Arluro "hides his money" at the address on 5th Avenue South. *Id.*

Affiant Carroll further states that, after executing the search warrant at the Cedar Avenue residence, officers went to the address on 5th Avenue South "to see if any of the keys recovered from 'Arluro's' associates would fit in the locks at the residence." *Id.* Sergeant Gomez "was able to unlock the perimeter doors" of the 5th Avenue South residence with the keys recovered from Defendant Martos, "who was originally stopped driving the gold Chevy Trailblazer . . . which was following the U-Haul when officers first stopped these individuals." *Id.*

Additionally, during the afternoon hours of March 30, 2010, Sergeant Stiller observed the gold Chevy Trailblazer parked in front of the address on 5th Avenue South. *Id.* Affiant Carroll adds that the CRI has been able to provide updated information to him about Arluro and his associates, and that they suspect "that law enforcement has been taking action" against them. *Id.*

Based upon the foregoing, on March 31, 2010, Hennepin County Judge Warren R. Sagstuen signed the search warrant application and search warrant for a nighttime search of the residence on "5th Ave S." *Id.* The search warrant receipt, inventory and return indicates that, among other items, multiple bricks of suspected marijuana and over $100,000 were recovered from the residence pursuant to a search conducted at 1:00 A.M. on March 31, 2010. (Gov't Ex. 4.)

**B.      Testimony**

**1.      Testimony of Officer James Carroll**

At the hearing, Officer Carroll testified that he received information from an informant "through [his] direct supervisor Sergeant Jose Gomez" about an organization, located in South Minneapolis, trafficking cocaine and marijuana. (Tr. 15-16, 19.) The CRI provided a specific description of a Hispanic male involved in the organization by the name of "Arluro Lopez," also known as "Camello" and "Arulo." (Tr. 16.) The CRI also related "that Camello was moving hundreds of pounds of weed and several kilos of cocaine." (Tr. 17.) Officer Carroll stated that the CRI "has pretty intimate knowledge of Camello and has seen him in possession of large quantities of narcotics in the past" and has also "seen him facilitate the sales of these narcotics." (Tr. 18.) About one week before March 30, 2010, the CRI also informed law enforcement that "narcotics were being stored" at an apartment building with an address on 18th Street East in Minneapolis. (T. 20.) While the CRI did not provide a specific apartment unit number, he did know that "Camello had two associates . . . that stayed guarding the stash in the apartment building." (Tr. 20.) He provided further information that Camello, also known as Arluro Lopez, resided at a specific address on 5th Avenue South at which he "stored his cash." (Tr. 20-21.) The CRI additionally "stated that Camello had a white Nissan Titan, a gold Chevy Trailblazer" as well as a silver, "newer body style Chevy Tahoe." (Tr. 21.)

Officer Carroll attempted to corroborate the CRI's information by "spot checking" the addresses on 18th Street and 5th Avenue South for the vehicles identified by the CRI. (*See* Tr. 21.) Additionally, he testified that Sergeant Gomez "went into the apartment building" at the address on 18th Street and found that a mailbox for a specific apartment unit "listed to an Arturo Lopez."

(Tr. 21-22.) With this information, about 3 days before March 30, 2010, Officer Carroll obtained a photograph from "the DVS website," of an individual listed as "Arluro Lopez," whose image had "striking similarities to the description provided by the CI." (Tr. 22.) Officer Carroll testified that "a couple of days" later, the CRI positively identified the photograph as the man he knows as "Arulo and Camello." (Tr. 23.) Officer Carroll further testified that the Minnesota State ID card lists the individual's name as "Arluro Lopez" with an address on 5th Avenue South. (Tr. 23.)

Sometime before March 30, 2010, the CRI related to Sergeant Gomez by phone that Arluro Lopez would be "moving the narcotics out of the 18th Street address to a new address." (Tr. 24, 27.) The CRI specifically stated "that Arluro Lopez and his associates were renting a U-Haul truck and were moving the stash location out of . . . 18th Street to a new location." (Tr. 25.) The CRI explained that Lopez feared the stash house would "get robbed" based upon a home invasion in the apartment complex "a week prior." (Tr. 25.) Through Minneapolis police reports, Officer Carroll was able to confirm that a home invasion did, indeed, take place on March 25, 2010 at a lower level apartment unit at the address on 18th Street. (Tr. 27.) Officer Carroll testified that police reports indicated that, during the home invasion, three to four Hispanic males forced entry into the apartment, "demanded to know where the money was, and demanded to know who was driving a truck" with a specific license plate number. (Tr. 27.) Officer Carroll then determined that the license plate registered to a 2004 white Nissan Titan at Arluro Lopez's apartment unit on 18th Street East. (Tr. 28.)

On March 30, 2010, the CRI contacted law enforcement "with updated information that they [Lopez and associates] were going to get a U-Haul truck and were in the process of moving

the stash to a new location" on that day. (Tr. 57.) On the same date, law enforcement conducted surveillance at the 18th Street and 5th Avenue addresses. (Tr. 28, 30.) At one point during the day, surveillance officers observed a gold Chevy Trailblazer at the 5th Avenue address. (Tr. 30.) Officer Carroll testified that, later that same day, surveillance officers reported observing a gold Chevy Trailblazer parked in the front of the building at the address on 18th Street as well as a U-Haul truck. (Tr. 29.) Officer Carroll then testified that surveillance officers observed two males moving items, including "large, plastic bags . . . yard bags," into the U-Haul truck from the apartment building. (Tr. 29-30.)

After loading the U-Haul, one individual entered the U-Haul, the other entered the Chevy Trailblazer, and both vehicles simultaneously pulled away. (Tr. 31.) Surveillance followed the vehicles and reported that the Trailblazer would lag behind the U-Haul about half a block to a block and would then pull over to the shoulder of the road; after the trailblazer would pull over, "the U-Haul would make the block and then afterward proceed into the next block and the Trailblazer would pull back off the block and follow the U-Haul again." (Tr. 32.) Officer Carroll testified that surveillance reported this maneuver occurring between 4 and 6 different times. (Tr. 32.) Additionally, "[t]here was really no rhyme or reason to their path of travel . . . . they would go a block, make a right hand turn, go up a block, take a left-handed turn, go down a block, take another left-handed turn." (Tr. 32.) Officer Carroll also testified that the driver of the Trailblazer "was checking the mirrors, looking to see if they were being followed." (Tr. 32.) Based on his experience, Officer Carroll concluded that the drivers "were conducting their own counter-surveillance to see if they were being followed . . . they were driving like they were trying to make sure nobody was following them." (Tr. 33.)

About ten minutes later, Officer Carroll directed a marked squad car to stop the U-Haul truck. (Tr. 33-34.) When the stop occurred, the "Chevy Trailblazer just immediately pulled over to the side of the road onto the shoulder." (Tr. 33-34.) Officer Carroll then, with the assistance of Officer John Biederman, "pulled alongside the Chevy Trailblazer." (Tr. 34.)

Both the driver of the U-Haul (Defendant Ortega) and the driver of the Trailblazer (Defendant Martos) were arrested at the scene. (*See* Tr. 34-35.) Officer Carroll testified that he personally searched Defendant Martos and recovered several keys and cash from his person. (Tr. 35.) A YMCA picture ID card was recovered from the search of Defendant Ortega's person. (Tr. 35-36.)

Officer Carroll also instructed Fourth Precinct Community Response Team officers to drive the two vehicles to the Third Precinct police station. (Tr. 36-37.) He testified that, at the station, a narcotics dog conducted an exterior sniff on the vehicles, and "indicated a hit . . . on the front cargo area" of the U-Haul. (Tr. 39.) The dog did not alert, however, on any area of the Chevy Trailblazer. (Tr. 39.)

Officer Carroll testified that he then drafted and obtained search warrants for both the U-Haul and the apartment on 18th Street East at the same time. (Tr. 39.) He further represented that, pursuant to the search of the interior of the U-Haul, officers recovered keys that were later found to fit the locks at the apartment on 18th Street. (Tr. 40.) Before executing the search warrant for the apartment on 18th Street, officers knocked on the door and announced their presence. (Tr. 41.) Then, "one of the officers . . . used the keys that we got out of the U-Haul and tried to unlock the locking mechanism with the keys." (Tr. 41.) Law enforcement did not recover any

evidence, however, from the apartment on 18th Street as "the apartment was completely empty." (Tr. 41.)

As law enforcement left the 18th Street apartment, Sergeant Gomez spoke to the CRI by phone. (Tr. 43.) Sergeant Gomez, Officer Carroll and the CRI then met in person. (Tr. 44.) At that time, the CRI stated that he had recently spoken with Arluro Lopez, who was alarmed because he did not know "where the U-Haul was" and was unable to contact his associates. (Tr. 44.) Arluro Lopez further told the CRI that the stash had been moved to a new address on Cedar Avenue South. (Tr. 44.) The CRI explained to officers that Lopez had requested that the CRI "go and check the address to see if the U-Haul and his associates were there." (Tr. 44.)

Officer Carroll, Sergeant Gomez and the CRI then drove to the specific address on Cedar Avenue provided by Lopez. (Tr. 44.) They arrived at about 8:00 P.M. and walked along the south side of the house. (Tr. 46.) Officer Carroll testified that, as he walked past the open window on the south side of the house, he could smell the odor of fresh marijuana. (Tr. 46.) Officer Carroll and Sergeant Gomez then entered the residence's screened-in porch area and approached the side door. (Tr. 47.) Officer Carroll handed Sergeant Gomez the keys recovered from Defendant Martos' person (Tr. 45), which Sergeant Gomez tested in the lock one by one. (Tr. 47.) Sergeant Gomez was able to unlock the deadbolt with one key and pushed the door "open about an inch . . . just enough to show that you could actually clear the threshold of the door." (Tr. 47.) Officer Carroll testified that "nobody crossed the threshold" and "nobody peered inside" because they "didn't know if there was anybody inside" the house. (Tr. 47.) The officers then shut the door and relocked it with the key. (Tr. 47.)

As they left the Cedar Avenue address, the officers were confronted by a female neighbor, who provided information that Hispanic males had moved in within "the last couple of days" and stated that "they were driving a newer silver Tahoe." (Tr. 48.) He further testified that the informant had initially provided information that Arluro and his associates utilized a silver Tahoe. (Tr. 48.)

Officer Carroll then drafted a search warrant for the address on Cedar Avenue. (Tr. 48.) When he approached Judge Warren Sagstuen, the signatory of all of the warrants, with the Cedar Avenue warrant application, the judge asked if the officers had recovered any narcotics from the U-Haul. (Tr. 85.) Officer Carroll testified that he informed Judge Sagstuen that no illegal drugs were recovered from the U-Haul truck. (Tr. 85.) Officer Carroll did not disclose, however, that nothing was recovered from the apartment on 18th Street. (*See* Tr. 85.)

After officers executed the Cedar Avenue search warrant, Sergeant Gomez and Officer Carroll "tried the locks" at the address on 5th Avenue South. (Tr. 53.) Sergeant Gomez was ultimately able to unlock a door at the 5th Avenue residence with one of the keys seized from Defendant Martos. (Tr. 54.) Officer Carroll testified that, again, they opened the door, but did not look inside and did not cross the threshold. (Tr. 54-55.) The "door was immediately shut and then re-secured." (Tr. 54.) Only after testing the locks did Officer Carroll draft the search warrant application for the 5th Avenue residence. (Tr. 55.) Officer Carroll further stated that "this address was one of the original addresses provided by the informant as a location" at which Arluro Lopez lives and keeps money. (Tr. 52.)

## 2.    Testimony of Sergeant Jose Frank Gomez

Minneapolis Police Sergeant Jose F. Gomez testified that he received a call on March 30, 2010 from the CRI that "the target in question was going to be renting a U-Haul at somewhere in the area of 36th and Nicollet, to possibly be moving quantities of narcotics and/or proceeds." (Tr. 88.) He further testified that he first came into contact with Defendants when he arrived on the scene in the afternoon of March 30, 2010 after Defendants had been arrested. (*See* Tr. 88.)

Sergeant Gomez also stated that he first spoke with Defendant Martos at the police station later in the day, but before the execution of the 18th Street warrant. (Tr. 89.) At that time, he obtained biographical data from Defendant Martos, including name, date of birth and address for the "CAPRS" form. (Tr. 89; *see* Gov't Ex. 7.) He similarly obtained biographical information from Defendant Ortega at "approximately the same time." (Tr. 90; *see* Gov't Ex. 7.) He did not, however, provide Defendants with a *Miranda* warning at that time. (Tr. 90.) At about 2:00 A.M. on March 31, 2010, he then interviewed Defendants a second time. (Tr. 92.) At the time of the second interviews, Sergeant Gomez administered a *Miranda* warning to both Defendants. (Tr. 93-94; Gov't Ex. 5.) Defendant Ortega invoked his right to counsel at that time (Tr. 95), however, Defendant Martos waived his rights and provided a statement (Tr. 93-94; Gov't Ex. 6).

Sergeant Gomez also testified that he tested the keys in the locks at the Cedar Avenue and 5th Avenue residences. (Tr. 95-96.) He stated that, at both residences, he unlocked the door, opened the door between half an inch and an inch, and then pulled the door closed and relocked it. (Tr. 96.)

## II.   CONCLUSIONS OF LAW

**A.   Arrest of Defendants**

**1.   Probable cause existed for Defendants' arrests.**

Defendants contend that their arrests on March 30, 2010 were not supported by probable cause and were thus unlawful; consequently, all evidence seized pursuant to searches conducted thereafter constitutes fruit of the poisonous tree. (Doc. Nos. 35, 42.)

"Probable cause for a warrantless arrest exists 'if the facts and circumstances within the law enforcement officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir. 1995), quoting *United States v. Morales,* 923 F.2d 621, 623 (8th Cir. 1991). "The probable cause determination does not depend upon individual facts," but rather "it depends on the cumulative effect of the facts in the totality of the circumstances." *Brown*, 49 F.3d at 1349 (quotation omitted).

"A key issue in determining whether information provided by an informant is sufficient to establish probable cause is whether that information is reliable. An informant may establish the reliability of his information by establishing a track record of providing accurate information." *Id.*, citing *Illinois v. Gates,* 462 U.S. 213, 233 (1983). If the informant is previously unknown to law enforcement, "the informant's lack of a track record requires some independent verification to establish the reliability of the information." *Brown*, 49 F.3d at 1349, citing *United States v. Robertson,* 39 F.3d 891, 893 (8th Cir. 1994). "Independent verification occurs when the information (or aspects of it) is corroborated by the independent observations of police officers." *Brown*, 49 F.3d at 1349, citing *Gates,* 462 U.S. at 241-45; *Draper v. United States,* 358 U.S. 307, 313 (1959); *Morales,* 923 F.2d at 625; *see also United States v. Marchena-Borjas*, 209 F.3d 698, 700 (8th Cir. 2000) ("The historical reliability of the confidential

informant, his provision of descriptive information not easily discoverable, and the independent corroboration of his information by investigating officers together established probable cause for Marchena-Borjas's arrest.")

Here, Officer Carroll testified that the CRI "has done a lot of work for Sergeant Gomez" (Tr. 49) and represented, in three of the four search warrant applications, that the CRI had previously provided "reliable and accurate information." (Gov't Exs. 2-4.) Even if the CRI did not have a "track record of providing accurate information," Officer Carroll was able to corroborate much of the information provided by the CRI. *See Brown*, 49 F.3d at 1349.

The CRI provided substantial information about the drug trafficking organization, including a name and description of its alleged leader, "Arulo" or "Camello." (Tr. 16.) The CRI also provided a description of three vehicles used by Camello (a white Nissan Titan, a gold Chevy Trailblazer and a Chevy Tahoe) as well as two specific addresses on 5th Avenue South and 18th Street East. (Tr. 20-21.) The CRI further described that the 18th Street apartment acted as a narcotics stash location while the 5th Avenue addressed served as a cash storage facility as well as Camello's primary residence. (Tr. 20-21.) In addition, the CRI explained that Camello (aka Lopez) planned to move the supply of drugs from the 18th Street apartment to a new storage location because of his fear that the stash house would be robbed. (Tr. 24-25.) The CRI further related that he had firsthand contact with Camello/Lopez. (Tr. at 18, 44.)

Officer Carroll and Sergeant Gomez were able to verify much of this information. Sergeant Gomez deciphered the name "Arturo Lopez" on the mailbox of the apartment unit at issue on 18th Street East. (Tr. 22.) Based on this discovery, Officer Carroll's DVS search resulted in the name of "Arluro Lopez," (Tr. 22) whose photograph was positively identified by the CRI

as the male he knew as "Arluro and Camello" (Tr. 23). In this way, officers were also able to confirm Lopez's connection to the 5th Avenue address, as the 5th Avenue address provided by the CRI listed as Lopez's residence on his Minnesota State ID card. (Tr. 23.)

Moreover, law enforcement officers confirmed, through existing police reports, that a home invasion had taken place in the 18th Street apartment complex on March 25, 2010, thus corroborating information provided by the CRI about Lopez's fear of a robbery. (Tr. 27.) Additionally, the relevant police reports indicate that the Hispanic males involved in the home invasion asked about a truck with a specific license plate number, which Officer Carroll discovered registered to a white Nissan Titan truck at the 18th Street address previously provided by the CRI. (Tr. 27-28.) Officer Carroll was, therefore, able to verify the information about Lopez's connection to the vehicle and the 18th Street residence.

Additionally, the CRI provided information on March 30, 2010, that "Arluro Lopez and his associates were renting a U-Haul truck and were moving the stash location out of . . . 18th Street to a new location." (Tr. 25.) Surveillance officers then corroborated that information by observing a gold Chevy Trailblazer parked in front of the residence on 18th Street, along with a U-Haul truck, that same day. (Tr. 29.) Officers then observed two individuals loading the U-Haul truck with large garbage bags. (Tr. 29-30.) Eventually, the two individuals left the 18th Street address together, one driving the U-Haul truck (Defendant Ortega) and the other driving the gold Chevy Trailblazer (Defendant Martos). (Tr. 31.)

Based upon officer investigation and observation, law enforcement was able to corroborate both descriptive and predictive elements of the CRI's information on or before March 30, 2010. *See Brown*, 49 F.3d at 1349. Therefore, the totality of the facts and

circumstances within Officer Carroll's knowledge were sufficient to warrant a reasonable belief that Defendants were committing, or were about to commit, an offense at the time of their arrest. *See id.* Consequently, Defendants' arrests were supported by probable cause.

## 2. Defendants' statements to law enforcement are admissible.

Defendants contend that their arrests and searches incident thereto were unlawful and without probable cause; thus, their subsequent statements to law enforcement constituted the fruit of their unlawful arrests under the Fourth Amendment. (Doc. Nos. 35, 42.) Neither Defendant challenges his statements to law enforcement, including biographical data, on any other basis.

Because the Court finds that Defendants' arrests in this case were supported by probable cause and were, therefore, lawful under the Fourth Amendment, Defendants' statements to law enforcement should not be suppressed as the fruits thereof.

## B. Search Warrants

## 1. Probable Cause Standard for Issuance of Search Warrants

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Under well-established Fourth Amendment jurisprudence, a valid search warrant must be supported by an affidavit providing the signing judge with a substantial basis for determining the existence of probable cause to believe a search would uncover evidence of wrongdoing. *Illinois v. Gates*, 462 U.S. 213, 236-39 (1983). Probable cause is defined as a "fair probability that contraband or evidence of a crime will be found in a particular place." *See id.* at 238. A supporting affidavit that consists of bare

17

conclusions or conclusory allegations cannot support a finding of probable cause.  *Id.*  Veracity, reliability, and basis of knowledge are "highly relevant" in determining whether a supporting affidavit establishes probable cause.  *Alabama v. White*, 496 U.S. 325, 328 (1990).

Still, because "reasonable minds" may differ as to whether a particular affidavit establishes probable cause, the Supreme Court has established a "good faith" exception to the warrant requirement, according great deference to a magistrate (or signing judge's) probable cause determination.  *See United States v. Leon*, 468 U.S. 897, 914 (1984) (citing *Spinelli v. United States*, 393 U.S. 410, 419 (1969)).  The *Leon* Court established that reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate should be admissible in the prosecution's case in chief. *Leon*, 468 U.S. at 913.  On the contrary, if a warrant is based on an affidavit "so lacking in indicia of probable cause to render official belief in its existence entirely unreasonable," the *Leon* good faith exception to the warrant requirement does not apply. *Id.* at 922-23.

Additionally, whether probable cause exists depends on the totality of the circumstances. *See Gates*, 462 U.S. at 238; *United States v. Gabrio*, 295 F.3d 880, 882-83 (8th Cir. 2002).  In evaluating the existence of probable cause, courts do not consider each piece of information independently, but instead consider the cumulative meaning of all facts taken together.  *See United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002).

> **2.**     **The search warrants were supported by probable cause.**

Defendants argue that, but for the information and evidence obtained by law enforcement as a result of their unlawful arrests, the search warrants would not have been issued; therefore, the warrants are invalid. For the reasons described above, Defendants' arrests were supported by

18

probable cause, and the facts included within the warrant applications which resulted from the arrests and searches of Defendants were properly incorporated.

Notably, the search warrant applications contain some additional information, above and beyond that which amounted to probable cause for Defendants' arrests. Specifically, the affidavits describe that a narcotics dog alerted to "the front and rear cargo area of the U-Haul" (Gov't Exs. 1-4), which resulted from an exterior sniff (Tr. 39). Additionally, after executing the 18th Street search warrant (Gov't Ex. 2), law enforcement received new information from the CRI, who related that he had spoken with Lopez, who requested that the CRI check to see if the U-Haul and his associates were at a specific address on Cedar Avenue South. (Gov't Exs. 3, 4; *see also* Tr. 44.) Sergeant Gomez and Officer Carroll then went to the Cedar Avenue residence, at which time they determined that one of the keys recovered from Defendant Martos unlocked a door to the residence. (Gov't Exs. 3, 4; *see also* Tr. 47). The keys were also tested in, and one was discovered to fit, a lock at the 5th Avenue residence. (Gov't Ex. 4.)

The Court expresses no opinion as to whether officers' testing of keys in the locks at the residences on Cedar Avenue South and 5th Avenue South constitutes a Fourth Amendment violation. *See generally United States v. Taylor*, 119 F.3d 625, 629-30 (8th Cir. 1997), *cert. denied* 522 U.S. 962 (1997). Because Defendants have not raised the argument in their briefs, they have waived it.

Still, based upon the totality of the facts contained within each search warrant affidavit, the Court finds that there existed a "fair probability that contraband or evidence of a crime" would be found in each of the four locations, such that probable cause existed sufficient for all four warrants to issue.

### 3. Defendants are not entitled to a *Franks* hearing.

Additionally, Defendants argue that, within his search warrant affidavits, Officer Carroll misrepresented, among other things, that the CRI provided law enforcement with Lopez's apartment number on 18th Street East, when in fact it was Sergeant Gomez who made that discovery. (*Compare* Gov't Ex. 1 *with* Tr. 21-22.) Defendants also contend that Officer Carroll's failure to disclose, in his applications for the Cedar Avenue and 5th Avenue warrants, that no narcotics were recovered from the U-Haul or the 18th Street apartment amounts to an omission sufficient to defeat probable cause. (*See* Gov't Exs. 3, 4.) Defendants further note Officer Carroll's failure to include a statement about the CRI's reliability in the search warrant application for the U-Haul (Gov't Ex. 1) and assert that there is no evidence that the CRI ever observed, firsthand, any narcotics at the apartment on 18th Street.[2]

Although Defendants have not explicitly moved for a *Franks* hearing, the Court notes that the warrant affidavits do not raise issues which necessitate a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). "To obtain a *Franks* hearing a defendant must make a substantial preliminary showing that there was an intentional or reckless false statement or omission which was necessary to the finding of probable cause, a requirement which is not easily met." *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008) (quotation omitted) ("[T]o prevail on a *Franks* claim the defendant must first demonstrate that the law enforcement official deliberately or recklessly included a false statement in, or omitted a true statement from, his warrant affidavit . . . The defendant must then show that the affidavit would not establish probable cause if the allegedly false information is ignored or the omitted information is

---

[2] The Court notes that the CRI's communication of any relevant information to Sergeant Gomez, as opposed to Officer Carroll directly, does not render the information inherently less reliable.

supplemented . . . Allegations of negligence or innocent mistake will not suffice to demonstrate reckless or deliberate falsehood.")

Here, Defendants have failed to make a substantial preliminary showing that Officer Carroll deliberately or recklessly made a false statement or omission in his warrant affidavits. Moreover, even if, for instance, the specific apartment number on 18th Street were stricken from the warrant affidavits, such a deletion would not defeat a finding of probable cause for the warrants to issue. Thus, Defendants have not demonstrated entitlement to a *Franks* hearing.

In sum, suppression of neither evidence nor statements is warranted with respect to Defendant Ortega and Defendant Martos. Thus, the evidence seized and statements made are admissible.

## III.    RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Ortega's motions be **DENIED** as follows:

1.    Defendant's Motion for Suppression of Statements, Answers or Admissions in the Nature of Confessions [#42] should be **DENIED**.

2.    Defendant's Motion for Suppression of Physical Evidence Obtained from a Search and Seizure [#43] should be **DENIED**.

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Martos' motions be **DENIED** as follows:

1.    Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [#34] should be **DENIED**.

2.      Defendant's Motion to Suppress Statements, Admissions and Answers [#35] should be **DENIED**.


DATED: May 25, 2010                    _s/ Franklin L. Noel_____
                                                       FRANKLIN L. NOEL
                                                       United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **June 8, 2010**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **June 8, 2010,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.